# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**MICHAELE TURNER,**

     *Plaintiff,*

      v.

Case Number:

**INAZIN LENDING d/b/a RISE UP LENDING, CLARITY SERVICES, INC.,** *and* **UNKNOWN COMPANIES 1-10,**

**JURY TRIAL DEMANDED**

     *Defendants.*

## COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW the Plaintiff, **Michaele Turner** ("**Mr. Turner**"), by and through his attorneys, Seraph Legal, P.A., and complains of the Defendants, **Inazin Lending**, doing business as **Rise Up Lending** ("**Rise Up Lending**"), **Clarity Services, Inc.** ("**Clarity**"), and **Unknown Companies 1-10** (collectively, the "**Defendants**"), stating as follows:

## PRELIMINARY STATEMENT

1.     This is an action brought by Mr. Turner against the Defendants for violations of the *Racketeer Influenced and Corrupt Organizations Act*, 18 U.S.C. § 1961, *et seq.* ("**RICO**"), Florida's *Civil Remedies for Criminal Practices Act*, § 772.101, Fla. Stat., *et seq.* ("**CRCPA**"), and against Rise Up Lending and Unknown Companies 1-10 for violations of the *Florida Consumer Collection Practices Act*, § 559.55, Fla. Stat.,

*et seq.* ("**FCCPA**") and the *Electronic Funds Transfer Act*, 15 U.S.C. § 1693, *et seq.* ("**EFTA**").

## JURISDICTION AND VENUE

2.  Subject matter jurisdiction for Plaintiff's federal claims arises under RICO, 18 U.S.C. § 1965, the EFTA, 15 U.S.C. § 1693m(g), and 28 U.S.C. § 1331.

3.  This Court has supplemental jurisdiction for Mr. Turner's state law claims pursuant to 28 U.S.C. § 1367.

4.  The Defendants are subject to the jurisdiction of this Court pursuant to § 48.193, Fla. Stat., and Fed. R. Civ. P. 4(k).

5.  Venue is proper in the Middle District of Florida pursuant to 28 U.S.C. §1391(b)(2) because the acts complained of were committed and / or caused by the Defendants within this District.

## PARTIES

### Mr. Turner

6.  **Mr. Turner** is a natural person residing in the City of Clearwater, Pinellas County, Florida, which is in the Middle District of Florida.

7.  Mr. Turner is a *Consumer* as defined by the FCCPA, § 559.55(8), Fla. Stat.

### Rise Up Lending

8.  **Rise Up Lending** is an online lender that offers loans to consumers at annual percentage rates in excess of 500% via its website, riseuplending.com.

9.     Rise Up Lending claims to be "a wholly owned subsidiary of Dakota Economic Development Corporation ("DEDC"), a sovereign economic arm, enterprise, and instrumentality of, and created for the benefit of, the Crow Creek Sioux Tribe, a federally recognized sovereign American Indian Tribe in South Dakota." *See riseuplending.com.*

10.     Rise Up Lending's listed contact address on its website is P.O. Box 636, Fort Thompson, SD 57339.

11.     Rise Up Lending can be served at the offices of the Dakota Economic Development Corporation, located at **22508 South Dakota Hwy 34, Fort Thompson, SD 57339.**

### Clarity

12.     **Clarity** is a Delaware corporation with a principal business address of 475 Anton Blvd., Costa Mesa, CA 92626.

13.     Clarity is registered to conduct business in the State of Florida, where its registered agent is **CT Corporation System, 1200 South Pine Island Rd., Plantation, FL 33324**.

### Unknown Companies 1-10

12.     **Unknown Companies 1-10** are entities involved in the making of short-term, high-interest loans via a business known as Rise Up Lending, which, ostensibly, is owned by Inazin Lending, a tribal lending entity operated by the Crow Creek Sioux Tribe of South Dakota.

14.     Unknown Companies 1-10 each provided services on loans issued by Rise Up Lending, such as providing capital to fund the loans, requesting consumer credit reports on potential borrowers, marketing the lending website, and/or servicing the loans.

15.     Plaintiff believes he can ascertain the identity of Unknown Companies 1-10 since their true name(s) are recorded in business records, such as domain name registration records, which Plaintiff should uncover in discovery.

16.     Upon uncovering the identities of such entities, Plaintiff will amend his complaint.

## FACTUAL ALLEGATIONS

### Rise Up Lending Makes Unlawful Loan to Plaintiff

17.     On or around June 10, 2024, Rise Up Lending made a loan to Mr. Turner in the principal amount of $875 (the "**Loan**"). **SEE PLAINTIFF'S EXHIBIT A.**

18.     The Loan had a stated annual percentage rate ("APR") of 568.66%. *Id.*

19.     The Loan required Mr. Turner to repay a total of $4,073.77 on a short-term, $875 loan.

20.     Rise Up Lending transferred the proceeds of the Loan through the ACH network into Mr. Turner's checking account which he maintained in Pinellas County, Florida.

21.     Shortly after the Loan was taken out, Rise Up Lending began debiting Mr. Turner's checking account via the ACH network.

22.     Mr. Turner made at least two payments of $101.77.

23.     The State of Florida has long recognized that lending money at usurious interest rates is immoral, harmful, and contrary to public policy.

24.     § 687.02(1), Fla. Stat., renders any loan usurious which is made at an interest rate greater than 18% per year.

25.     § 687.071(3), Fla. Stat., renders loans made with annual interest rates greater than 45% a third-degree felony.

26.     § 687.071(7), Fla. Stat., renders any criminally usurious loan void and unenforceable.

27.     Long-standing public policy in Florida confirms the impossibility of the alleged debts. *Richter Jewelry Co. v. Schweinert*, 169 So. 750, 758-59 (Fla. 1935) (criminally usurious loans are "void as against the public policy of the state as established by its Legislature.")

28.     Any person who willfully makes a criminally usurious loan, in addition to subjecting themselves to criminal sanctions, forfeits the right to collect payment for the loan. *Id.*

29.     Indeed, even the recovery of the principal balance made at usurious rates is impermissible under Florida law. *Rollins v. Odom*, 519 So. 2d 652, 656 (Fla. Dist. Ct. App. 1988).

30.     The purpose of the usury statutes is to protect the needy borrower by penalizing the unconscionable money lender. *Stubblefield v. Dunlap*, 148 Fla. 401, 4 So.2d 519 (1941); *see also Pushee v. Johnson*, 123 Fla. 305, 166 So. 847 (1936); *River Hills, Inc. v. Edwards*, 190 So.2d 415 (Fla. 2d DCA 1966).

31.     Florida has taken usury one step further in the consumer loan context through the passing of the Consumer Finance Act, Chapter 516, Florida Statutes (the "Act").

32.     The Act requires licensure and state oversight for lenders issuing loans to Florida consumers in the amount of $25,000 or less. § 516.02(1), Fla. Stat.

33.     The Act further restricts the interest and fees which may be charged by a licensed consumer finance company.

34.     § 516.02(c), Fla. Stat., indicates that any loan which fails to comply with the Act is unenforceable in Florida *even if valid wherever made.*

35.     Thus, Florida has made clear that in order to enforce a consumer loan against a Florida resident, a lender must be licensed in Florida and comply with the Consumer Finance Act.

36.     Mr. Turner's Loan charged an annual interest rate of 568.66%, more than 18 times the rate permitted by the Act.

37.     Rise Up Lending is not licensed as a Consumer Finance Company in Florida.

38.     The Loan is thus unenforceable against Mr. Turner, regardless of whether it is valid under tribal law or wherever else it may have been made.

39.     Further, because the Loan is subject to an annual interest rate greater than 45%, which exceeds the limit as proscribed in § 678.071(3), Fla. Stat., the Loan's balance is void *ab initio* and unenforceable in Florida, pursuant to § 687.071(7), Fla. Stat.

40.     The balance relating to the Loan is therefore an *unlawful debt* pursuant to § 772.102(2)(a)(3), Fla. Stat.

41.     The proceeds from the Loan were used by Mr. Turner for the purchase of goods and services for personal, family, or household purposes, and thus the Loan meets the definition of *Debt* under the FCCPA, § 559.55(6), Fla. Stat.

42.     Rise Up Lending made multiple collection communications to Mr. Turner, via e-mail, and text message.

43.     Rise Up Lending, directly or via service providers, reported the Loan to Clarity, a nationwide *consumer credit reporting agency* ("CRA"). **SEE PLAINTIFF'S EXHIBIT B.**

44.     By reporting the Loan to a CRA, Rise Up Lending certified that the Loan is a legally valid debt, which it is not.

45.     Rise Up Lending reported an illegal, unenforceable debt to the CRAs in order to hold Mr. Turner's credit report hostage, thereby ensuring payment of the usurious loan.

46. Reporting a debt to a CRA is an attempt to collect the debt alleged therein. See, e.g., *Edeh v. Midland Credit Management, Inc.*, 748 F. Supp. 2d 1030 (D. Minn. 2010) ("The Court has learned, through its work on countless [Fair Debt Collection Practices Act] cases, that threatening to report and reporting debts to CRAs is one of the most commonly-used arrows in the debt collector's quiver.")

### Rent-A-Tribe Schemes

47. Rise Up Lending is a purportedly tribal lending entity owned and operated by the Crow Creek Sioux Tribe (the "Tribe"), which issues short-term, high-interest-rate loans via its website, riseuplending.com.

48. Per its website, Rise Up Lending also claims to be a subsidary of the "Dakota Economic Development Corporation, a sovereign economic arm, enterprise, and instrumentality of, and created for the benefit of, the Crow Creek Sioux Tribe."

49. However, the website of the Dakota Economic Development Corporation, dakotaeconomic.com, makes no mention of Rise Up Lending or consumer lending in any capacity.

50. In reality, the Crow Creek Tribe has virtually nothing to do with the operation of the lending business and simply participates in what is often referred to as a "rent-a-tribe" scheme.

51.     In such a scheme, non-tribal payday lenders attempt to circumvent state usury laws by invoking the sovereign immunity available to Native American tribes.

52.     While the non-tribal entities operate all substantive aspects of the business such as funding, marketing, loan origination, underwriting, loan servicing, electronic funds transfers, and collections for the high-interest loans, the tribe acts as a label or figurehead in exchange for what is often a relatively insignificant portion of the revenue generated.

53.     However, sovereign immunity does not turn an otherwise illegal loan into a legal one; at best, it potentially creates a defense to criminal or civil prosecution of the crime. *See, e.g., United States v. Neff*, No. 18-2282 (3d Cir. Sep. 6, 2019) (upholding criminal convictions of two individuals engaged in an online payday lending rent-a-tribe scheme; "reasonable people would know that collecting unlawful debt is unlawful").

54.     Supposedly, Rise Up Lending operates under a lending license granted by the Crow Creek Financial Services Licensing & Regulatory Commission. **SEE PLAINTIFF'S EXHIBIT C.**

55.     The "commission" has but one commissioner – Shane Thin Elk ("Thin Elk") – who is not a member of the Crow Creek Tribe.

56.     Thin Elk is an attorney who previously lived in Omaha, Nebraska, and formerly practiced law with Fredericks Peebles & Morgan LLP, a law firm

with a significant practice devoted to, per its website, "PROTECTING Tribal Sovereignty."

57.     Thin Elk claims to be an expert in "rent-a-tribe" matters and was a speaker at a Tribal Employment Rights & Law Conference in April 2014 in Prior Lake, Minnesota. The program for the seminar summarized his speech as, "Structuring the system: Essential elements for workable Tribal codes; selecting or creating effective grievance and dispute resolution bodies and processes; special considerations for partnering with non-Tribal entities for commercial enterprises." **SEE PLAINTIFF'S EXHIBIT D.**

58.     Tellingly, Thin Elk also supposedly holds the identical job as "commissioner" of the Financial Services Licensing & Regulatory Commission for a completely different, unrelated tribe – the Native Village of Minto (the "Minto Tribe"), in Minto, Alaska.

59.     The Minto Financial Services Licensing & Regulatory Commission – whose only commissioner is Thin Elk – issued a single license so far in its history: to Minto Money, an online lender which provides payday loans to consumers at interest rates close to 800% annually.

60.     The Minto Tribe is a small, isolated, financially-strapped Native American tribe with approximately 223 enrolled members, located about 75 miles northwest of Fairbanks, Alaska.

61.     Minto Money claims to operate from offices located at 205 Lakeview Dr., Suite 7, Minto, AK 99758; however, the building located at 205 Lakeview Drive does not contain any offices divided into suites, and is used for school and senior lunch programs, community meetings, and village council operations.

62.     Minto Money is operated by Douglas Isaacson and his related entities and investors; Isaacson is not a member of the Minto Tribe.

63.     Even a cursory examination of the "license" issued by Thin Elk to Rise Up Lending in September 2023 reveals it is virtually a copy-and-paste job from the license issued by Thin Elk to Minto Money in June 2019. **SEE PLAINTIFF'S EXHIBITS C and E.**

64.     Both licenses contain identical verbiage, formatting (*e.g.*, use of boldface and italics are identical and in identical places), and even the identical copy-and-pasted signature.

### Rise Up Lending is a Racketeering Conspiracy

65.     Online tribal lending is considered "off-reservation" conduct. *Hengle v. Treppa*, 19 F.4th 324, 348-49 (4th Cir. 2021).

66.     Moreover, none, or virtually none, of Rise Up Lending's business is conducted on the Tribe's reservation.

67.     Rather, all essential business operations are performed in other locations outside of the Tribe's jurisdiction, and, predominantly, outside of South Dakota.

68.     The server for riseuplending.com operates from an IP address of http://20.118.56.9/, corresponding to a physical location in Des Moines, Iowa, which is nearly 500 miles from the Tribe's reservation. **SEE PLAINTIFF'S EXHIBIT F.**

69.     Off-reservation business operations, comprising substantially all of the company's functions, are conducted by and for the benefit of non-tribal members and investors.

70.     These operations include incoming and outgoing phone calls and emails, review of loan applications, loan underwriting, payment processing, website maintenance and marketing.

71.     The Tribe has engaged in many other similar "rent-a-tribe" schemes with other non-tribal investors in the past.

72.     For example, until recently, the Tribe engaged in a scheme with Devwire Consulting, LLC and Scott Frasier Turnbull, beneficial owners of the lending platform MyLoanSite.com; the website made loans to consumers in Florida at interest rates typically exceeding 700% annually.

73.     The Tribe also currently engages in a "rent-a-tribe" scheme with the California-based CreditServe, Inc. and operates a lending business called River Valley Loans, which makes loans to consumers at rates typically exceeding 700% annually.

74.     On March 12, 2024, the Washington State Department of Financial Institutions issued a "Consumer Alert" that Rise Up Lending is engaged in unlicensed, predatory lending within Washington State[1].

## **ACH Payments Reflect Attempt to Disguise Business**

75.     Rise Up Lending makes predatory loans to consumers with unstable finances who are in desperate need of money.

76.     Thus, access to the ACH network is of critical importance for lenders like Rise Up Lending, since it is imperative to have the ability to electronically debit a borrower's checking account on the day they get paid to make the lending enterprise viable.

77.     The ACH network is administrated by the *National Automated Clearing House Association* ("NACHA"), which implements numerous requirements that participating payment processors must meet.

78.     One such requirement is that *Originating Depository Financial Institutions* ("ODFIs") must gather detailed information about the business operations of their customers to whom they grant access to the ACH network. The ODFIs "are the gatekeepers of the ACH Network." *2013 NACHA Operating Rules, Section 2.1 General Rule – ODFI is Responsible for Entries and Rules Compliance (2013 NACHA Operating Rules & Guidelines, Page OR4).*

---

[1] https://dfi.wa.gov/consumer/alerts/crow-creek-sioux-tribe-dba-riseup-lending-and-inazin-lending-tribal-loan-company-not

79.     In 2013, the United States Department of Justice ("DOJ") initiated Operation Choke Point and investigated a large number of banks that processed ACH transactions for payday lenders, as well as other companies believed to be at a high risk for fraud and money laundering. As a result of this, many larger banks, including Capital One Bank and Fifth Third Bank, terminated ACH processing for payday lenders. In March 2015, the DOJ announced a civil and criminal settlement with CommerceWest Bank due, in large part, to the bank's processing of payday loan fees.

80.     Although Operation Choke Point wound down in August 2017, its effects are still felt today by the online payday lending industry, as no large banks – and only a handful of smaller banks – will knowingly process ACH transactions for legal, licensed payday lenders.

81.     Thus, an entire cottage industry exists of ACH payment brokers and middlemen servicing the "tribal" payday lending industry.

82.     These brokers and middlemen gain the ability to process ACH transactions through small banks and then re-sell access to the ACH network, at considerable mark-ups.

83.     These brokers and middlemen often obfuscate – or outright lie – to their ODFI about the end-user's actual business.

84. Indeed, Mr. Turner's Wells Fargo bank statement shows Rise Up Lending is registered and categorized as a "hair care/beauty supply" company with the ACH:

| 06/21/24 | Rise Up Lending 8556097473 240620 1400278 Michaele Turner | $101.77 |
|---|---|---|

Details

Category: **Hair Care/Beauty Supply**

85. As is axiomatic, Rise Up Lending is not a hair care or beauty supply enterprise.

86. Because few, if any, banks are willing to risk the liability that comes with processing payments for predatory online lenders, Rise Up Lending engaged in fraud by partnering with a broker or middleman, often referred to as an Independent Sales Organization ("ISO")[2], who was able to get Rise Up Lending approved as a "hair care/beauty supply" company.

87. An ISO is a non-bank, third-party organization which has a relationship with an ODFI and re-sells access to that bank's access to the ACH network (and, often, payment associations like Visa and Mastercard); the term Merchant Service Provider ("MSP") is sometimes used interchangeably.

88. Because ISOs add fees or mark-ups to the cost of each transaction processed, virtually all merchants in traditional industries obtain payment processing services directly through an ODFI, and not through a third-party ISO.

---

[2] The identity of the ISO is unknown to Plaintiff at present, but is reasonably discoverable, and is included in Unknown Companies 1-10.

89.     However, for businesses deemed "high risk," like tribally-affiliated payday lending, ISOs are just about the only option to gain access to ACH and debit card processing networks.

90.     Federal regulatory action against ISOs is not unusual as ISOs facilitate payment processing for unlawful or fraudulent entities. See, e.g., *In the Matter of Electronic Payment Systems, LLC* et. al, Agreement Containing Consent Order, file 1523213, Federal Trade Commission, March 15, 2022 (ISO agreed to terminate operations due to systemic processing of payments for fraudulent companies); *Federal Trade Commission v. Qualpay Inc.*, case 6:20-cv-00945, M.D. Fla, June 1, 2020 ($46.8 million judgment obtained against ISO who processed payments for entities selling fraudulent "start your own business" schemes to consumers); *Federal Trade Commission v. First Data Merchant Services LLC.*, case 1:20-cv-03867, S.D. NY, May 19, 2020 ($40.2 million settlement by ISO which processed payments for fraudulent "debt relief" schemes).

91.     By certifying to the ODFI which processes payments for it, or certifying to the ISO knowing this certification would be passed on to the ODFI, that Rise Up Lending was not engaged in online payday lending but rather sold hair and beauty supplies, Rise Up Lending willfully and knowingly made false statements to a financial institution.

92.     The making of a false statement to a financial institution is itself a criminal act; *see* 18 U.S.C. § 1344, *et seq.*

## Clarity Knowingly Facilitates Loansharking

93.     Clarity is a nationwide CRA which primarily services the needs of online payday lenders like Rise Up Lending – *e.g.*, lenders making short-term, small-dollar loans at triple-digit interest rates.

94.     Clarity maintains terabytes of proprietary data specifically tailored to assist online, subprime lenders in evaluating potential borrowers, including consumers' checking account histories, employment and salary data, and past payday loan experiences.

95.     Clarity then supplements this data with information from its parent company, Experian Information Solutions, Inc. ("Experian"), one of the "Big 3" nationwide CRAs, as well as with data from other specialty CRAs, including Chex Systems.

96.     Clarity merges its own data with that obtained from Experian and Chex Systems into one report, which it then sells to online lenders.

97.     Indeed, on June 10, 2024, the date Mr. Turner applied for his Loan from Rise Up Lending, Clarity sold a consumer report regarding Mr. Turner to Rise Up Lending. **SEE PLAINTIFF'S EXHIBIT G.**

98.     Clarity's consumer report regarding Mr. Turner was obtained by non-tribal entities acting on behalf of Rise Up Lending.

99.     Clarity has extensive policies in place to conduct due diligence on potential new customers, which includes, in most cases, sending an investigator to the primary business office of the lender.

100.    In situations where a lender is "tribally" owned but obtains consumer reports through a non-tribal service provider, Clarity typically sends its investigator to the offices of the service provider.

101.    Clarity also examines the states the lender does business in, and the lender's website, including pages which show the interest rates, terms, and fees assessed.

102.    Clarity has had numerous lawsuits filed against it concerning its provisioning of credit reports to online payday lenders with sham tribal affiliation, like Rise Up Lending.

103.    Clarity has also produced several detailed reports for the online lending industry, such as its 2019 *Alternative Financial Services Lending Trends Insights into the Industry and its Consumers*, which it stated analyzed 350 million loan applications and 25 million loans. Most of the loans were small-dollar, short-term loans made by online lenders.

104.    Clarity thus knew, when furnishing a consumer report regarding Mr. Turner, that the data it was providing was in connection with the making of a loan at a triple-digit interest rate.

105.    While Clarity possessed significant and detailed knowledge of the Rise Up Lending loansharking enterprise, Plaintiff "need not establish that each conspirator had knowledge of all the details of the conspiracy but, rather, only that the defendant participated in the conspiracy with knowledge of the essential nature of the plan." *United States v. Tillett*, 763 F.2d 628, 632 (4th Cir. 1985).

106.    Clarity's assistance in Rise Up Lending's "rent-a-tribe" scheme is of critical importance.

107.    Absent the trove of data Clarity knowingly supplied for use by Rise Up Lending, no such loan could have, or would have, been made to Mr. Turner.

108.    Likewise, without access to the ACH network – access which required dressing up an online lender as a hair and beauty sales company – the Rise Up Lending racketeering enterprise also would have disintegrated.

109.    Beyond this, Clarity accepts tradeline data from Rise Up Lending, which data includes loan amounts, payments due, and payment history.

110.    Indeed, Rise Up Lending, or its service provider, reported Mr. Turner's Loan to Clarity.

111.    Rise Up Lending reported to Clarity that Mr. Turner's Loan was in the principal amount of $875, opened June 10, 2024, with a first due date of June 21, 2024. **SEE PLAINTIFF'S EXHIBIT B.**

112.    Rise Up Lending further reported that the Loan had a balance of $3,972 as of June 26, 2024. ***Id.***

113. Clarity was thus on notice that Mr. Turner's Loan from Rise Up Lending charged interest at annual rates which vastly exceeded the maximum legal rate in most states, including Florida.

114. By including the Rise Up Lending tradeline in reports sold regarding Mr. Turner, Clarity knew it was helping to facilitate collection of the unlawful debt.

115. For years, courts have recognized the power of credit reporting to procure payment. A creditor's "ability to report on the credit habits of its customers is powerful tool designed, in part, to wrench compliance with payment terms." *Rivera v. Bank One*, 145 F.R.D. 614, 623 (D.P.R. 1993).

116. Reporting a debt to a CRA is an attempt to collect that debt. *Denan v. Trans Union LLC*, No. 19-1519, at 6 (7th Cir. May 11, 2020) ("Consumer reporting agencies and furnishers, though interrelated, serve discrete functions: furnishers report data to incentivize the repayment of debts, while consumer reporting agencies compile and report that data for a fee."); *Edeh v. Midland Credit Management, Inc.*, 748 F. Supp. 2d 1030 (D. Minn. 2010); *Sullivan v. Equifax, Inc.*, No. CIV.A. 01-4336, 2002 WL 799856 4 (E.D. Pa. Apr. 19, 2002) ("[R]eporting a debt to a credit reporting agency can be seen as a communication in connection with the collection of a debt . . . subject[ing] a debt collector to liability under the FDCPA.").

117.  Moreover, Clarity spends what is likely hundreds of thousands of dollars each year promoting itself and its services directly to online lenders like Rise Up Lending.

118.  For example, Clarity was a "Gold Level" sponsor of the Online Lenders Alliance ("OLA") 2022 and 2023 Tribal Lending Conference; one of its employees, Paul Mitchell, a Senior Account Executive, was also a speaker at the conference and gave insights into what kind of consumers are likely to look for, and accept the terms of, "tribal" payday lenders.

119.  At all times relevant, all of the Defendants sought to serve the Florida market.

120.  Therefore, the Defendants are subject to the jurisdiction of a Florida court. *See Avicolli v. BJ's Wholesale Club, Inc.*, 2021 WL 3471167, at *3 (E.D. Pa. Aug. 6, 2021) (holding a "defendant is properly subject to jurisdiction in a state where it seeks to serve that state's market.")

121.  RICO defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

122.  In *Boyle v. United States*, the Supreme Court recognized that RICO's definition of enterprise was "obviously broad" and included an "association in fact" enterprise. 556 U.S. 938, 944 (2009).

123.   Thus, an enterprise may be a legally recognized entity like a corporation or an "association in fact enterprise," *i.e.*, "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981); *Boyle*, 556 U.S. at 948 ("[A]n association-in-fact enterprise is simply a continuing unit that functions with a common purpose.")

124.   Here, Rise Up Lending, Clarity, and Unknown Companies 1-10 are an *association in fact enterprise* who are associated together for the common purpose of making, collecting, and profiting from illegal loans, in some cases directly, and in others indirectly.

**Rise Up Lending Violates the EFTA By Requiring Electronic Payments**

125.   When Mr. Turner applied for a loan, he was required to provide his bank account and routing number for the purpose of allowing Rise Up Lending and Unknown Companies 1-10 to automatically debit payments electronically from his bank account.

126.   RiseUpLending.com only accepts applications online and the website will not allow an application for credit to proceed without the consumer supplying bank account and routing information. **SEE PLAINTIFF'S EXHIBIT H.**

127.   When Mr. Turner was approved for a loan, he was provided with several documents to electronically sign, including a Loan Agreement and a "DISBURSEMENT AND PAYMENT CHOICE AUTHORIZATION."

128.   The "Payment Choice Authorization" includes a provision whereby Mr. Turner was required to consent to Rise Up Lending initiating ACH debits from his account to make the required weekly loan payments.

129.   While couched as voluntary, Rise Up Lending will not approve a loan application which does not contain a signed electronic payment agreement.

130.   Moreover, a consumer can only terminate the electronic funds transfer authorization *after* a loan has been originated.

131.   Rise Up Lending's business model of making unsecured subprime consumer loans depends on being able to debit loan payments concurrently to when the consumer is paid, thereby being the "first in line" to receive proceeds from the consumer's paycheck.

132.   Indeed, loan applicants are required to disclose to Rise Up Lending their pay schedule to facilitate Rise Up Lending's capture of payments. **SEE PLAINTIFF'S EXHIBIT I.**

133.    Under Regulation E, the implementing regulation of the EFTA, "[n]o … person may condition an extension of credit to a consumer on the consumer's repayment by preauthorized electronic fund transfers…." 12 C.F.R. § 205.10(e)(1); 15 U.S.C. § 1693k(1).

134.   Thus, Rise Up Lending violated the EFTA when it conditioned the Loan on Mr. Turner's consent to ACH debits.

135.    Mr. Turner has made payments to Rise Up Lending for the null, void, and unenforceable loan made to him.

136.    Mr. Turner has been damaged in that he has paid one or more of the Defendants for a loan that was void and criminally usurious pursuant to Florida law.

137.    Mr. Turner also suffered emotional distress as a result of the Defendants' attempts to collect an unenforceable debt.

138.    Mr. Turner has hired the aforementioned law firm to represent him in this matter and has assigned her right to fees and costs to such firm.

### COUNT I
### VIOLATIONS OF THE CRCPA, § 772.103(3), FLA. STAT.

139.    Mr. Turner adopts and incorporates Paragraphs 1 – 138 as if fully restated herein.

140.    The Defendants, through their participation in the furtherance of the Rise Up Lending scheme, along with the Crow Creek Tribe, and other persons, natural and otherwise, constitute an *Enterprise* under the CRCPA, § 772.102(3), Fla. Stat.

141.    The Loan made to Mr. Turner through Rise Up Lending charged an interest rate far in excess of Florida's maximum permitted rate, pursuant to § 687.071(3), Fla. Stat.

142.     Thus, the Loan's balance constitutes an *Unlawful Debt* under § 772.102(2)(a)(3), Fla. Stat.

143.     The Defendants each associated with the enterprise and participated in the affairs of the enterprise as described in detail herein, which existed for the purpose of collection of unlawful debt.

144.     The Defendants each participated in this conspiracy. Rise Up Lending and Unknown Companies 1-10 operated RiseUpLending.com, and Clarity provided the consumer data necessary for its operation.

145.     The Defendants' participation in the enterprise violated **§ 772.103(3), Fla. Stat.**, and caused Mr. Turner to repay amounts on the unlawful Loan from Rise Up Lending.

**WHEREFORE,** Mr. Turner respectfully requests this Honorable Court enter judgment against the Defendants, jointly and severally, ordering:

a.     Threefold the amount of actual damages or, in the alternate, the statutory minimum of **$200**, whichever is greater, pursuant to § 772.104(1), Fla. Stat.;

b.     Reasonable costs and attorneys' fees pursuant to § 772.104(1), Fla. Stat.; and,

c.     Any other relief this Court deems equitable and proper under the circumstances.

## COUNT II
## <u>VIOLATIONS OF THE CRCPA, § 772.103(4), FLA. STAT.</u>

146.    Mr. Turner adopts and incorporates Paragraphs 1 – 138 as if fully restated herein.

147.    The Defendants, through their participation in the furtherance of the Rise Up Loans scheme, along with the Crow Creek Tribe, and other persons, natural and otherwise, constitute an *Enterprise* under the CRCPA, § 772.102(3), Fla. Stat.

148.    As described in detail herein, the Defendants are a group of individuals and entities associated in fact, although they are not a single legal entity. Particularly, Defendants presently listed as Unknown Companies 1-10 and Rise Up Lending operated essential functions of RiseUpLending.com, including facilitating the making of false statements to a federally insured financial institution (*e.g.*, that Rise Up Lending was a hair/beauty supplies company) in order to gain access to the ACH network. Clarity is associated in fact by virtue of its ongoing business relationship with Rise Up Lending, whereby it provides the underlying data necessary for Rise Up Lending to evaluate potential borrowers for its high interest rate loans and publishes information about payment history concerning these loans in credit reports it sells.

149.    The Loan made to Mr. Turner through Rise Up Lending charged an interest rate far in excess of Florida's maximum permitted rate, pursuant to § 687.071(3), Fla. Stat.

150.    Thus, the Loan's balance constitutes an *Unlawful Debt* under § 772.102(2)(a)(3), Fla. Stat.

151.    Violations of Chapter 687, Fla. Stat., amount to "criminal activity" as defined in § 772.101(1)(a), Fla. Stat.

152.    The Defendants violated **§ 772.103(4), Fla. Stat.,** by conspiring with each other, and other persons and entities, to issue and collect unlawful debts through Rise Up Lending.

153.    The Defendants were aware of the goals of the enterprise and each took actions in furtherance of this conspiracy. For example, at various times, the Defendants have: (a) issued the Loan to Mr. Turner; (b) requested and obtained a consumer credit report regarding Mr. Turner; (c) sold a consumer credit report regarding Mr. Turner to assist with review of his loan application; (d) initiated ACH deposits and withdrawals to and from Mr. Turner's bank account; (e) attempted collection of the Loan; (f) reported Mr. Turner's Loan to Clarity; and, (g) incorporated tradeline data regarding the loan in reports sold regarding Mr. Turner.

154.   The Defendants each agreed to participate in the conspiracy and agreed to the overall objective of the conspiracy – to collect unlawful debts through Rise Up Lending.

**WHEREFORE,** Mr. Turner respectfully requests this Honorable Court enter judgment against the Defendants, jointly and severally, ordering:

a.   Threefold the amount of actual damages, or in the alternate, the statutory minimum of **$200**, whichever is greater, pursuant to § 772.104(1), Fla. Stat.;

b.   Reasonable costs and attorneys' fees pursuant to § 772.104(1), Fla. Stat.; and,

c.   Any other relief this Court deems equitable and proper under the circumstances.

### COUNT III
### <u>VIOLATIONS OF THE FCCPA, § 559.72(9), FLA. STAT.</u>
### Rise Up Lending and Unknown Companies 1-10

155.   Mr. Turner adopts and incorporates Paragraphs 1 – 138 as if fully restated herein.

156.   Rise Up Lending and Unknown Companies 1-10 violated **§ 559.72(9), Fla. Stat.**, when they attempted to collect – and did collect – a loan made to Mr. Turner by Rise Up Lending, therein asserting the legal right to collect such loan.

157.   The Loan was illegitimate and unenforceable due to the application of interest rates in excess of 500% annually on the principal amount of the loan, in

violation of § 687.071, Fla. Stat., and the Defendants knew, or should have known, the loan was unenforceable in Florida.

158.   The actions of Rise Up Lending and Unknown Companies 1-10 were willful, intentional, and done for the express purpose of collecting an unenforceable debt from Mr. Turner and profiting from such collection.

159.   Rise Up Lending and Unknown Companies 1-10 each knew of the illegal nature of the Loan, as the Defendants have gone to great lengths to attempt to avoid Florida law through use of a "rent-a-tribe" scheme.

**WHEREFORE,** Mr. Turner respectfully requests this Honorable Court enter judgment against Rise Up Lending and Unknown Companies 1-10, jointly and severally, ordering:

a.  Statutory damages of **$1,000.00**, pursuant to § 559.77(2), Fla. Stat.;

b.  Actual damages, pursuant to § 559.77(2), Fla. Stat.;

c.  Injunctive relief preventing the Defendants from attempting to collect alleged loan balances from Mr. Turner made at unlawful rates, pursuant to § 559.77(2), Fla. Stat.;

d.  Reasonable costs and attorney's fees pursuant to § 559.77(2), Fla. Stat.; and,

e.  Such other relief that this Court deems just and proper.

**COUNT IV**
**<u>VIOLATIONS OF THE EFTA, 15 U.S.C. § 1693k(1)</u>**
**Rise Up Lending and Unknown Companies 1-10**

160.    Mr. Turner adopts and incorporates Paragraphs 1 – 138 as if fully stated herein.

161.    Rise Up Lending and Unknown Companies 1-10 violated **15 U.S.C. § 1693k(1),** either willfully and intentionally, or recklessly and without regard for a consumer's rights, when they conditioned the approval of a loan upon Mr. Turner "voluntarily" agreeing to electronic payments.

**WHEREFORE,** Mr. Turner respectfully requests this Honorable Court enter judgment against Rise Up Lending and Unknown Companies 1-10, jointly and severally, for:

a.    Actual damages pursuant to 15 U.S.C. § 1693m(1);

b.    Statutory damages of $1,000, and no less than $100, per incident, pursuant to 15 U.S.C. § 1693m(a)(2)(A);

c.    Reasonable costs and attorneys' fees pursuant to 15 U.S.C. § 1693m(a)(3); and,

d.    Any other relief this Court deems equitable and proper under the circumstances.

## COUNT V
## <u>VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)</u>

176.   Mr. Turner adopts and incorporates Paragraphs 1 – 138 as if fully restated herein.

177.   The Defendants, through their participation in the furtherance of the Rise Up Lending scheme, along with the Crow Creek Tribe, and other persons, natural and otherwise, constitute an *Enterprise* as defined by 18 U.S.C. § 1961(4).

178.   The Loan charged an interest rate far in excess of Florida's maximum permitted rate, and thus the balance of the Loan is an *Unlawful Debt* pursuant to 18 U.S.C. § 1961(6).

179.   The Defendants each associated with the enterprise and participated in the affairs of the enterprise as described in detail herein, which existed for the purpose of collection of unlawful debt.

180.   The Defendants' participation in the enterprise violated **18 U.S.C § 1962(c)** and caused Mr. Turner to repay amounts on the unlawful Loan.

**WHEREFORE,** Mr. Turner respectfully requests this Honorable Court enter judgment against the Defendants, jointly and severally, ordering:

a.   Threefold the amount of actual damages;

b.   Reasonable costs and attorneys' fees pursuant to 18 U.S.C § 1964(c);

c.   Any other relief this Court deems equitable and proper under the circumstances.

## COUNT VI
## <u>VIOLATIONS OF RICO, 18 U.S.C § 1962(d)</u>

181.    Mr. Turner adopts and incorporates Paragraphs 1 – 138 as if fully restated herein.

182.    The Defendants, through their participation in the furtherance of the Rise Up Lending scheme, along with the Crow Creek Tribe, and other persons, natural and otherwise, constitute an *Enterprise* as defined by 18 U.S.C. § 1961(4).

183.    The Loan charged an interest rate far in excess of Florida's maximum permitted rate, and thus the balance of the Loan is an *Unlawful Debts* pursuant to 18 U.S.C. § 1961(6).

184.    The Defendants violated **18 U.S.C § 1962(d)** by conspiring with each other, and other entities and individuals, to issue and collect unlawful debts through Rise Up Lending.

185.    The Defendants were each aware of the goals of the enterprise and each took actions in furtherance of this conspiracy. For example, at various times, the Defendants have: (a) issued the Loan to Mr. Turner; (b) requested and obtained a consumer credit report regarding Mr. Turner; (c) sold a consumer credit report regarding Mr. Turner to assist with review of his loan application; (d) initiated ACH deposits and withdrawals to and from Mr. Turner's bank account; (e) attempted collection of the Loan; (f) reported Mr. Turner's Loan to Clarity; and,

(g) incorporated tradeline data regarding the loan in reports sold regarding Mr. Turner.

186.   The Defendants each agreed to participate in the conspiracy and agreed to the overall objective of the conspiracy – to make and collect unlawful loans through Rise Up Lending.

**WHEREFORE,** Mr. Turner respectfully requests this Honorable Court enter judgment against the Defendants, jointly and severally, ordering:

a.   Threefold the amount of actual damages;

b.   Reasonable costs and attorneys' fees pursuant to 18 U.S.C § 1964(c);

c.   Any other relief this Court deems equitable and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Mr. Turner hereby demands a jury trial on all issues so triable.

Respectfully submitted this July 12, 2024 by:

**SERAPH LEGAL, P. A.**

/s/ Brandon D. Morgan
Brandon D. Morgan, Esq.
Florida Bar Number: 1015954
BMorgan@SeraphLegal.com
Thomas M. Bonan, Esq.
Florida Bar Number: 118103
TBonan@SeraphLegal.com
2124 W. Kennedy Blvd., Ste. A
Tampa, FL 33606
Tel: 813-567-1230 (Ext: 305)
Fax: 855-500-0705
*Counsel for Plaintiff*

## ATTACHED EXHIBIT LIST

A    Mr. Turner's Loan Agreement with Rise Up Lending, June 10, 2024 - Excerpt

B    Mr. Turner's Clarity Consumer Disclosure, June 27, 2024, Loan Tradeline - Excerpt

C    Crow Creek Certificate of Licensure, Financial Services Company, September 12, 2023

D    Overview of Tribal Employment Rights & Law Conference, April 2014

E    Minto Tribe Certificate of Licensure, Financial Services Company, June 3, 2019

F    Server Location for riseuplending.com

G    Mr. Turner's Clarity Consumer Disclosure, June 27, 2024, Inquiry - Excerpt

H    Rise Up Lending Requires Banking Information - Excerpt

I    Rise Up Lending Requires Paycheck Frequency - Excerpt